# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* L FOUTY, Minor.

UNPUBLISHED
June 15, 2017

No. 335546
Muskegon Circuit Court
Family Division
LC No. 2013-042948-NA

Before: O'BRIEN, P.J., and HOEKSTRA and BOONSTRA, JJ.

PER CURIAM.

Respondent, the father of the minor child LF, appeals by right the trial court's order terminating his parental rights to LF under MCL 712A.19b(3)(g).[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In August 2013, petitioner filed a petition seeking the removal of LF, six days old at the time, from his parents' home. The petition alleged that Children's Protective Services (CPS) had received a complaint that LF's mother had mental health issues that limited her ability to parent LF and suffered from delusional thoughts that LF was suffocating, and that respondent was aware of these issues but continued to leave LF in her care. The petition also alleged that respondent had multiple mental illness diagnoses and that in 2010 he had sexually abused LF's mother, then 16 years old.

LF was removed from the home. The trial court allowed petitioner to exercise its discretion to place LF with respondent if LF's mother moved out of their home. Respondent and LF's mother were married at the time.

LF's mother was adjudicated by a plea of admission in August 2013. At that time, our Supreme Court had not yet abolished the "one parent doctrine" (as it later did in *In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014)), therefore respondent was not separately adjudicated at that time. LF was placed with respondent after his mother was placed in an inpatient mental health institution following a self-harm episode. In October 2014, after several review hearings,

---

[1] LF's mother was also a respondent in the proceedings below. Her parental rights were terminated via plea and she is not a party to this appeal.

-1-

LF's mother was allowed to return home and the petition was dismissed. Respondent was employed at this time and attending marital counseling with LF's mother.

On December 29, 2014, petitioner filed another petition for LF's removal. The petition alleged that LF had been brought to petitioner's office by Misty Slater, who stated that she did not know LF's last name, had not seen or heard from his parents in two days, and had no ability to contact LF's parents. The petition also alleged that Slater had had her parental rights to her first child terminated, and that a termination petition was currently pending with regard to another child of hers who had been removed from her care. LF was removed from the home again and respondent was given supervised parenting time. Respondent testified at a review hearing that he had known Slater for 10 years and that Slater's allegations were not true. He testified that he and LF's mother had left LF in the care of Slater on December 28 and were planning on picking him up the next day, but were informed by the police that LF was at petitioner's office. Respondent testified that Slater had mental issues and was a chronic liar.

Throughout 2015, respondent and LF's mother had a chaotic, on-and-off relationship where they vacillated between trying to work on their marriage and getting divorced. LF's lawyer-guardian ad litem (LGAL) informed the court that LF had developmental delays and that respondent lacked the ability to care for LF and LF's mother at the same time. In April 2015, petitioner filed a supplemental petition alleging that LF was improperly supervised and at risk of harm in respondent's home, and that respondent continued to provide improper supervision by leaving him with inappropriate caretakers, including Slater. An amended petition filed in June 2015 alleged that, despite filing for divorce earlier in 2015, respondent and LF's mother continued to engage in a relationship and had engaged in public sexual behavior at a mental health facility.

Following the release of *Sanders*, respondent was adjudicated by jury trial in September 2015. A CPS investigator testified that respondent had a history of leaving LF with inappropriate caretakers, including at least three people with a history of CPS involvement. The investigator testified that respondent was provided with services including a psychological evaluation, a parent mentor, infant mental health treatment, and individual and couples counseling. A parent mentor testified that respondent did not pay attention to LF, did not teach him appropriate eating skills, and was primarily focused on his relationship with LF's mother. Another parent mentor testified that respondent did not use a required thickener in liquids that he provided to LF, which placed LF at risk of choking. Dr. Joseph J. Auffrey, a psychologist, testified regarding his psychological evaluations of both respondent and LF's mother. Respondent's counsel objected to Dr. Auffrey's testimony and the introduction of LF's mother's psychological evaluation on relevance grounds, but the objection was overruled. The jury found sufficient evidence for the court to exercise its jurisdiction regarding respondent's parental rights.

At a review hearing in December 2015, LF's mother testified that respondent had used physical violence to force her to have sexual relations with him. Respondent had missed three counseling appointments and was not participating in all of the services provided. Respondent's home was not appropriate for a child, as it was extremely filthy, infested with fleas, and also contained machetes and firearms that were not properly stored. Respondent did not appear to

take LF's swallowing problems seriously and gave LF hard candies even though they caused him to choke.

In 2016, LF's mother was granted a personal protection order (PPO) against respondent. Respondent's home continued to be unclean and infested with fleas. Respondent missed several of LF's medical appointments and did not attend several parenting time sessions. Respondent continued to fail to appropriately thicken liquids for LF or prevent him from choking on food. LF was still very developmentally delayed and relied on sign language, which respondent did not learn and use during sessions.

A termination hearing was held beginning in April 2016 and ending in September 2016. The trial court took judicial notice of the psychological evaluations of Dr. Auffrey in the adjudication trial. The court heard testimony that LF had significant developmental delays in multiple areas, was nonverbal, and continued to have problems with choking on food and liquids. Respondent missed an appointment to work with LF's teacher in learning how to model behaviors for LF. Respondent's parent mentor, Kevin Schmitt, testified that respondent was primarily hampered by his obsession with his relationship with LF's mother. Respondent's counselor also opined that respondent was hampered in parenting LF by his relationship with LF's mother, especially during periods where the relationship was not going well. Respondent's caseworker testified that respondent continued to have contact, including sexual contact, with LF's mother despite the divorce and PPO. The caseworker also testified that the cleanliness of respondent's home had never been sufficient during her involvement with the case. There was animal fecal matter on the floor, repeated flea infestations, and the utilities were periodically shut off for nonpayment. There also had been issues with inappropriate people living in the home, including multiple persons with prior CPS involvement who had had children removed from their care. The caseworker opined that respondent could not provide LF with proper care and custody because he struggled with parenting, communication, and coping skills and LF has extensive needs and parenting requirements.

Following the hearing, the trial court issued a written opinion and order terminating respondent's parental rights. The trial court found that there was clear and convincing evidence that respondent, without regard to intent, had failed to provide proper care or custody for LF and that there was no reasonable expectation that respondent would be able to provide proper care and custody within a reasonable time considering LF's age. The trial court found that respondent had not attended meetings involving the services available for LF's special needs and developmental delays, which included delays in cognition, communication, and motor skills, as well as difficulties with choking while eating and drinking. Respondent had not shown progress in his parenting skills. The trial court also noted that respondent's "obsessive" relationship with LF's mother interfered with his ability to provide proper care for LF and his ability to focus his attention on LF's needs. Respondent also had contact with LF's mother in violation of the PPO prohibiting such contact. With respect to respondent's home, the trial court found that the home was messy, had animal feces on the floor, was infested with fleas, and that respondent did not rectify the home environment. Respondent was unable to provide proper care for LF due to the home environment and his continuing relationship with LF's mother, and respondent admitted that he had not made progress in these areas or in the areas of parenting time and counseling.

The trial court also found that termination was in LF's best interests, noting LF's special needs as well as his need for stability and permanency. The trial court noted that respondent had been provided with services for over three years without sufficient improvement.

This appeal followed.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that there was not clear and convincing evidence to support termination pursuant to MCL 712A.19b(3)(g). We disagree.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). This Court "review[s] for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest." *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000), abrogated by statute on other grounds as stated in *Moss*, 301 Mich App at 83, 88. "A circuit court's decision to terminate parental rights is clearly erroneous if, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003). "Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error," *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009), and this Court "give[s] deference to the trial court's special opportunity to judge the credibility of the witnesses," *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009).

The trial court terminated respondent's parental rights pursuant to MCL 712A.19b(3)(g), which provides:

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

In support of its holding, the trial court noted respondent's failure to attend meetings for the purpose of addressing LF's special needs and developmental delays; LF's choking episode caused by respondent's failure to follow instructions related to LF's food that were designed to prevent choking; the fact that respondent's "obsessive" relationship with LF's mother interfered with his ability to focus on LF's needs and provide proper care; respondent's failure to rectify the condition of his home, which was messy, infested with fleas, and had animal feces on the floor; and respondent's lack of progress in the areas of parenting skills, parenting time, home environment, the relationship with LF's mother, and counseling.

With respect to the home environment, while there was evidence that respondent made some progress on addressing these concerns, respondent's caseworker testified that respondent's home was still not, and to her knowledge never had been, suitable for LF to live in. Evidence that a respondent is unable to maintain suitable housing supports a conclusion that a respondent

-4-

failed to provide proper care or custody under MCL 712A.19b(3)(g). *In re Trejo*, 462 Mich at 362-363.

Additionally, there was testimony that LF had significant developmental delays in cognition, communication, and motor skills; qualified for special education services; and needed to have his liquids thickened because of difficulties with eating. Respondent was observed during parenting time giving LF liquids without adding the thickener, giving LF solid food that presented a choking hazard, and not showing concern or taking any action when LF was choking on food. Respondent also failed to show up for meetings with LF's teacher designed to help respondent address LF's special needs. Respondent also admitted that while he had attended some of LF's most recent medical appointments, he had not attended all of the appointments since his adjudication. Respondent missed multiple parenting time visits and was late to other parenting time visits. This evidence also supports the trial court's decision to terminate respondent's parental rights under subsection (g).

With respect to respondent's relationship with LF's mother, there was substantial evidence that respondent's focus on the relationship took priority over and interfered with respondent's ability to focus on and care for LF. Respondent's counselor testified that the relationship followed a cyclical pattern that included good and bad periods and was marked by arguing, LF's mother leaving the house, and infidelity. The nature of this relationship affected respondent's ability to parent and caused instability for LF. Despite the fact that respondent's divorce became final before the final termination hearing, there was significant evidence that respondent continued to have contact with LF's mother after the divorce. Schmitt testified that he was unable to work with respondent on many of the skills necessary to appropriately meet LF's special developmental and medical needs because his sessions with respondent would be spent discussing issues regarding respondent's relationship with LF's mother. Moreover, there was overwhelming evidence throughout the proceedings that LF's needs were secondary to that relationship and that respondent would maintain contact with LF's mother in violation of court orders. The nature of the relationship between respondent and LF's mother and its interference with respondent's ability to properly care for LF supports the trial court's decision to terminate respondent's parental rights under subsection (g). See *In re Dearmon*, 303 Mich App 684, 688, 692, 700; 847 NW2d 514 (2014).

Furthermore, the trial court did not clearly err by determining that there was no reasonable expectation that respondent would be able to provide proper care and custody considering LF's age. There was substantial evidence that, even though LF had been removed from his care after being left overnight with Slater, respondent had a pattern of leaving LF with unapproved care providers with CPS histories. The caseworker testified at the final termination hearing that respondent had regressed in the areas of counseling, visiting LF, maintaining a clean home, maintaining a home environment free of unapproved people, discontinuing his relationship with LF's mother, and abiding by the PPO against him. All of these areas were part of respondent's case plan. Respondent admitted that he had regressed in all of these areas with the exception of counseling. Considering the fact that LF was three years old and had been under the court's jurisdiction since shortly after his birth and in foster care for almost two years, there was no reasonable expectation that respondent would be able to provide proper care and custody within a reasonable time considering LF's age. If anything, respondent's conduct over the course of the case showed a decline in the likelihood that he would be able to care properly

for LF. A trial court may consider a respondent's history of being unable to provide proper care and custody for a child in determining that there is no reasonable expectation that the respondent will be able to do so within a reasonable time considering the child's age. See *In re Archer*, 277 Mich App 71, 75-76; 744 NW2d 1 (2007); *In re Williams*, 286 Mich App 253, 273; 779 NW2d 286 (2009).

Therefore, the trial court did not clearly err by finding that respondent, without regard to intent, failed to provide proper care and custody for LF and that there was no reasonable expectation that he would be able to do so within a reasonable time considering LF's age. MCL 712A.19b(3)(g); *In re Trejo*, 462 Mich at 356-357.

## III. ADMISSION OF EVIDENCE

Next, respondent argues that the trial court abused its discretion by admitting evidence during respondent's adjudication trial concerning Dr. Auffrey's psychological evaluation of LF's mother; and thus erred in considering this evidence during the termination hearing. We disagree.

During the trial, respondent objected on relevance grounds to the introduction of Dr. Auffrey's testimony and report concerning the psychological evaluation of LF's mother, and the objection was overruled. Therefore, this issue is preserved. *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014).

"A trial court's evidentiary rulings in a child protection proceeding are reviewed for an abuse of discretion," *In re Jones*, 286 Mich App 126, 130; 777 NW2d 728 (2009). We "review de novo preliminary questions of law affecting the admission of evidence, e.g., whether a statute or rule of evidence bars admissibility." *In re Martin*, 316 Mich App 73, 80; ___ NW2d ___ (2016). "An abuse of discretion occurs when the trial court chooses an outcome that falls outside the range of principled outcomes." *In re Utrera*, 281 Mich App 1, 15; 761 NW2d 253 (2008) (quotation marks and citation omitted). "The relevancy and admissibility of evidence depends on the purpose for which it is offered." *In re Jones*, 286 Mich App at 130.

"[T]he Michigan Rules of Evidence apply in adjudication trials." *In re Dearmon*, 303 Mich App at 696, citing MCR 3.972(C)(1). "Relevance is the fundamental component of the law of evidence," and "[e]vidence that is relevant should be admitted, unless barred by some other rule." *Id.* (quotation marks and citation omitted). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "The purpose of an adjudication is to determine whether the child is neglected within the meaning of [MCL 712A.2(b) ]," and the ultimate question for the jury "is whether a respondent's actions or inactions created an unfit environment for the children." *In re Dearmon*, 303 Mich App at 698 (quotation marks and citation omitted; alteration in the original). At the adjudication trial, "the petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition." *In re Sanders*, 495 Mich at 405.

Here, the petition alleged that the trial court's jurisdiction was predicated on MCL 712A.2(b)(1) and (2), which afford jurisdiction to the trial court in the following circumstances:

(b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

(1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. As used in this sub-subdivision:

(A) "Education" means learning based on an organized educational program that is appropriate, given the age, intelligence, ability, and psychological limitations of a juvenile, in the subject areas of reading, spelling, mathematics, science, history, civics, writing, and English grammar.

(B) "Without proper custody or guardianship" does not mean a parent has placed the juvenile with another person who is legally responsible for the care and maintenance of the juvenile and who is able to and does provide the juvenile with proper care and maintenance.

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

Specifically, the petition alleged in relevant part that LF's mother was taken to the hospital on August 7, 2013 for a psychiatric evaluation after reporting that she was having irrational and delusional thoughts; that CPS visited the family home on August 8, 2013 and discovered that respondent had left LF in LF's mother's care while respondent was at work; that LF's mother admitted to CPS on August 8 that she has had irrational and delusional thoughts about LF since he was born and that she was incapable of caring for LF due to her cognitive impairments; that LF's mother had a history of cognitive and emotional issues, including a lack of age-appropriate social presence, and inability to express herself; and that respondent admitted to CPS on August 8 that he was concerned about the ability of LF's mother to care for him.

During respondent's adjudication trial, the prosecutor asked Dr. Auffrey, who testified as an expert in psychology, about his psychological evaluation and diagnostic impression of LF's mother. After respondent's counsel objected on relevance grounds, the prosecution explained the relevance of Dr. Auffrey's opinions with respect to LF's mother's psychological evaluation as follows:

And I think when we're dealing with, number one, what the risk is to have a child left in [mother's] care which is what [respondent] did previously when the petition was first filed, to have the jury have a full understanding of what that risk level was. And [mother's] capability to parent a child, I think that's very relevant as we indicate that they kind of go part and parcel together because the issue in this case is that largely has to do with [mother].

-7-

The trial court overruled the objection, permitted Dr. Auffrey to testify about his opinions, and allowed Dr. Auffrey's report of LF's mother's psychological evaluation to be admitted into evidence. Regarding LF's mother's psychological evaluation, Dr. Auffrey testified that she "had an inadequate and dependent personality," that her general functioning was at an adolescent level, and that she was particularly deficient in judgment and problem-solving skills. According to Dr. Auffrey, LF's mother displayed symptoms of bipolar disorder, had mood swings, and had some apparent psychotic phenomena or "imagining things that were happening that weren't realistically appraised that way by others." Dr. Auffrey indicated that her symptoms could have been caused by a single post-partum episode or hormonal shift, but that her symptoms could also be part of an ongoing, chronic problem. Regarding her parental fitness and risk to a child in her care, Dr. Auffrey opined that her risk was at "the severe level" because she would need a great deal of assistance to consistently manage basic parenting tasks due to her personality deficiencies and mood disorder. Dr. Auffrey also opined that LF's mother's prognosis at the time of his examination was "poor" for being able to successfully parent independently.

The significance of LF's mother's cognitive impairments and the nature of her delusions were a central issue at trial because the petition alleged that respondent had neglected LF by, among other things, leaving him in the primary care of his mother on the day after she had been taken to the hospital for experiencing delusional and irrational thoughts and when she was incapable of caring for LF due to her long-standing cognitive impairments. As a result, it was necessary to show why LF's mother was unable to properly care for LF and consequently why respondent's decision to leave LF in her primary care constituted neglect under MCL 712A.2(b)(1) or (2). Therefore, this evidence was relevant, and the trial court did not abuse its discretion by admitting it. MRE 401; *In re Jones*, 286 Mich App at 130.

Further, the admission of the challenged evidence was not unfairly prejudicial. MRE 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "[U]nfair prejudice refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Pickens*, 446 Mich 298, 336-337; 521 NW2d 797 (1994) (quotation marks and citation omitted). In other words, "[u]nfair prejudice exists when marginally relevant evidence might be given undue or preemptive weight by the jury or when it would be inequitable to allow use of such evidence." *Allen v Owens-Corning Fiberglas Corp*, 225 Mich App 397, 404; 571 NW2d 530 (1997); see also *In re MU*, 264 Mich App 270, 272, 285; 690 NW2d 495 (2004).

As noted, the evidence relating to LF's mother's psychological evaluation was highly probative in establishing the risk of harm presented to LF when respondent left him in her care. With respect to whether this testimony was unfairly prejudicial, it was clear throughout the trial that respondent was not being held responsible for LF's mother's psychological and cognitive issues, but rather for his own actions that included leaving LF in her primary care despite her psychological problems and inability to properly care for LF. Indeed, the trial court informed the jury that the case was about whether the trial court could exercise jurisdiction over respondent and that the case was not about LF's mother. Therefore, evidence of LF's mother's

psychological evaluation did not result in presenting issues that were extraneous to those of the adjudication trial and did not present a risk that the jury would make a decision based on an improper reason such as bias, sympathy, anger, or shock. *Pickens*, 446 Mich at 336-337.

## IV. LIMITATION OF CROSS-EXAMINATION

Finally, respondent argues that the trial court abused its discretion during the termination hearing by not permitting respondent's counsel to ask follow-up questions of Schmitt after the trial court questioned Schmitt about respondent's ability to provide proper care and custody for LF and about respondent's relationship with LF's mother. We disagree.

This Court "review[s] for an abuse of discretion a trial court's exercise of its power to control the interrogation of witnesses." *Barksdale v Bert's Marketplace*, 289 Mich App 652, 655; 797 NW2d 700 (2010).

"It is well established that the trial court has a duty to control trial proceedings in the courtroom and has wide discretion and power in fulfilling that duty." *People v Biddles*, 316 Mich App 148, 153; ___ NW2d ___ (2016). Furthermore, "a court has wide latitude to impose reasonable limits on cross-examination to ensure relevancy or because of concerns regarding such matters as harassment, prejudice, confusion of the issues, and repetitiveness." *Id.*; see also MRE 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.").

Here, after respondent's counsel completed his cross-examination of Schmitt, the trial court questioned Schmitt about respondent's ability to provide proper care and custody for LF and the effect that respondent's relationship with LF's mother had on respondent's ability to care for him. Respondent's counsel then tried to explore this point further, but the trial court did not allow counsel to elicit testimony from Schmitt concerning a hypothetical situation in which respondent would have completely cut off contact with LF's mother:

> [*Counsel for respondent*]: If this man eliminates [mother] from his life, and from [LF's] life at least his presence—
>
> *The Court*: [Counsel], I guess I'm going to object to this line of questioning. We had three years of your client being presented with that option. And his testimony is that it hasn't happened.
>
> [*Counsel for respondent*]: Well, my client was just adjudicated in September, your Honor.
>
> *The Court*: Correct, but he's been involved in the case since the birth of this child.
>
> [*Counsel for respondent*]: If the Court won't let me ask the question, I'll sit down.

*The Court*: Alright. If the question is along the lines of "can he parent this child alone," it's never happened in three years. So, is there a different line of questioning that you'd like to, is that—

[*Counsel for respondent*]: No, I'd wanted to follow up on the Court's questioning about the prospect that my client would be able to provide reasonable, proper care and custody within a reasonable time considering the child's age. The Court won't let me pursue that, then I will cease my questioning.

*The Court*: Alright. You may step down.

Notably, respondent's counsel had already cross-examined Schmitt before the trial court initiated its questioning, and had already elicited testimony from Schmitt concerning respondent's parenting abilities absent his relationship with LF's mother. Specifically, respondent's counsel's earlier cross-examination of Schmitt, during the same hearing, included the following:

[*Counsel for respondent*]: So, essentially is your opinion that if he's free of [mother], this man is capable of being a good, loving and—

[*Schmitt*]: I think he would be a better father. A lot better father.

[*Counsel for respondent*]: One where you wouldn't recommend termination?

[*Schmitt*]: If [mother] wasn't in the picture, it would make me think about it, yeah.

The trial court has wide discretion in controlling the courtroom proceedings and may reasonably limit cross-examination to prevent repetitiveness. *Biddles*, 316 Mich App at 154. Respondent does not explain why it was unreasonable for the trial court to not allow the same question to be asked a second time. Respondent's counsel also characterizes the trial court's statement that "it's never happened in three years" as referring to respondent's ability to provide proper care and custody. Considered in context, the trial court's statement is more properly understood as referring to the fact that respondent had not been able to end the relationship with LF's mother in three years. In sum, the trial court did not abuse its discretion by prohibiting respondent's counsel from pursuing this line of follow-up questions. See *Barksdale*, 289 Mich App at 655.

Moreover, any potential error was harmless because respondent had already asked the question of Schmitt and received his answer. See *People v Thorin*, 126 Mich App 293, 300; 336 NW2d 913 (1983) (holding that even if it was erroneous for the trial court to sustain an objection

that precluded defense counsel from asking a particular question on cross-examination of an expert witness, "the error became harmless when defense counsel directed the same question to a subsequent expert witness and was given an answer."); see also MCR 2.613(A).

Affirmed.


/s/ Colleen A. O'Brien
/s/ Joel P. Hoekstra
/s/ Mark T. Boonstra